IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

---------------------------------------------------------

MICHAEL HOGAN,                          :
837 West Grant Street                   :
Easton, PA 18042,                       :
                                        :
ANN HOGAN,                              :
837 West Grant Street                   :
Easton, PA 18042,                       :
                Plaintiffs              :   CIVIL ACTION NO. 04-CV-
                                        :
        -v-                             :
                                        :
CITY OF EASTON,                         :   JURY TRIAL DEMANDED
1 South Third Street                    :
Easton, PA  18042,                      :
                                        :
THOMAS GOLDSMITH,                       :
FORMER MAYOR,                           :
CITY OF EASTON                          :
(individually and in his official capacity)  :
1 South Third Street                    :
Easton, PA  18042,                      :
                                        :
LARRY PALMER,                           :
FORMER CHIEF OF POLICE,                 :
CITY OF EASTON POLICE DEPARTMENT        :
(individually and in his official capacity)  :
1 South Third Street                    :
Easton, PA  18042,                      :
                                        :
JOHN MAZZEO, JR.,                       :
FORMER CAPTAIN,                         :
CITY OF EASTON POLICE DEPARTMENT        :
(individually and in his official capacity)  :
1 South Third Street                    :
Easton, PA  18042,                      :
                                        :
BRIAN T. HERNCANE,                      :
CITY OF EASTON POLICE DEPARTMENT        :
(individually and in his official capacity)  :

1 South Third Street                          :
Easton, PA  18042,                            :
                                              :
CHRISTOPHER G. MILLER,                        :
CITY OF EASTON POLICE DEPARTMENT              :
(individually and in his official capacity)   :
1 South Third Street                          :
Easton, PA  18042,                            :
                                              :
STEVEN J. PARKANSKY,                          :
CITY OF EASTON POLICE DEPARTMENT              :
(individually and in his official capacity)   :
1 South Third Street                          :
Easton, PA  18042,                            :
                                              :
SCHELDON M. SMITH,                            :
CITY OF EASTON POLICE DEPARTMENT              :
(individually and in his official capacity)   :
1 South Third Street                          :
Easton, PA  18042,                            :
                                              :
MICHAEL ORCHULLI,                             :
CITY OF EASTON POLICE DEPARTMENT              :
(individually and in his official capacity)   :
1 South Third Street                          :
Easton, PA  18042,                            :
                                              :
DAVID M. BEITLER,                             :
CITY OF EASTON POLICE DEPARTMENT              :
(individually and in his official capacity)   :
1 South Third Street                          :
Easton, PA  18042,                            :
                                              :
DOMINICK W. MARRACCINI,                       :
CITY OF EASTON POLICE DEPARTMENT              :
(individually and in his official capacity)   :
1 South Third Street                          :
Easton, PA  18042,                            :
                                              :
JOHN D. REMALEY,                              :
CITY OF EASTON POLICE DEPARTMENT              :

2

(individually and in his official capacity)    :
1 South Third Street                            :
Easton, PA  18042,                             :
                                                :
EUGENE SCOTT CASTERLINE,                        :
CITY OF EASTON POLICE DEPARTMENT                :
(individually and in his official capacity)    :
1 South Third Street                            :
Easton, PA 18042,                              :
                                                :
NORTHAMPTON COUNTY,                             :
Northampton County Government Center            :
669 Washington Street                           :
Easton, PA 18042,                              :
                        Defendants.             :

## COMPLAINT

Plaintiffs Michael Hogan and Ann Hogan bring this suit to recover for federal constitutional and statutory violations, as follows:

## PARTIES

1.      Plaintiff Michael Hogan is a resident of 837 West Grant Street in the City of Easton, Northampton County, in the Commonwealth of Pennsylvania.

2.      Plaintiff Ann Hogan is a resident of 837 West Grant Street in the City of Easton, Northampton County, in the Commonwealth of Pennsylvania.

3.      Defendant City of Easton is a municipality in Northampton County, Pennsylvania.

4.      Defendant Thomas Goldsmith was at all relevant times, the Mayor of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.  At all relevant times, Defendant Goldsmith had policymaking authority for the City and was responsible for supervising the actions of the Police Department and its officers.

3

5.      Defendant Larry Palmer was at all relevant times the Chief of the Police Department of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.  At all relevant times, Defendant Palmer had policymaking authority for the City and was responsible for supervising the actions of the Police Department and its officers.

6.      Defendant John Mazzeo, Jr. was at all relevant times a Captain with the Police Department of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.  At all relevant times, Defendant Mazzeo was the SWAT supervisor and was responsible for supervising the other police officers identified herein.

7.      Defendant Michael J. Orchulli was at all relevant times a Lieutenant with the Police Department of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.  At all relevant times, Defendant Orchulli was the shift supervisor and was responsible for supervising the other police officers identified herein.

8.      Defendant Steven J. Parkansky was at all relevant times a Lieutenant with the Police Department of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.  At all relevant times, Defendant Orchulli was a supervisory official and was responsible for supervising the other police officers identified herein.

9.      Defendant Brian T. Herncane was at all relevant times a Patrol officer with the Police Department of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.

10.     Defendant Christopher G. Miller was at all relevant times a Patrol officer with the Police Department of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.

11.     Defendant Scheldon M. Smith was at all relevant times a Patrol officer with the Police Department of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.

12.     Defendant David M. Beitler was at all relevant times a Patrol Officer with the Police Department of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.

13.     Defendant Dominic W. Marraccini was at all relevant times a Patrol Officer with the Police Department of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.

14.     Defendant John D. Remaley was at all relevant times a Detective with the Police Department of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.

15.     Defendant Eugene S. Casterline was at all relevant times a Detective with the Police Department of the City of Easton, Northampton County, Pennsylvania.  He is sued in his individual and official capacities.

16.     Defendant Northampton County is a municipality located within the Eastern District of Pennsylvania.

JURISDICTION AND VENUE

17.      Jurisdiction in this Court is asserted under the provisions of 28 U.S.C. §1331 and

§1343.   This action arises under the provisions of the Civil Rights Act of 1866, as amended 42 U.S.C.

§1983, and Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §12132.

18.      Venue is appropriately laid in this Court pursuant to 28 U.S.C. 1391(b) in that the

actions complained of took place within the District and the Plaintiffs and Defendants have carried on

business within the District.


FACTUAL ALLEGATIONS ON THE MERITS

19.      On February 25, 2002, at approximately 9:31 p.m., Defendants Orchulli, Remaley,

Marraccini, Beitler and Casterline fired at least fourteen (14) shots at Michael Hogan from close range,

striking him at least three (3) times and nearly killing him.

20.      At the time these Defendants shot Mr. Hogan, he was in his own home, following the

instructions of Defendant Miller, and attempting to surrender to the police.

21.      Born in August 1967, Mr. Hogan is a high school graduate and a United States Marine

Corps veteran.

22.      Mr. Hogan had never been arrested before and had no prior criminal record.

23.      Michael Hogan and Ann Hogan have been married since November 1991.

24.      At the time of the events at issue herein, Mr. Hogan had a significant psychiatric

impairment; the U.S. Social Security Administration found Mr. Hogan disabled in August 2001.

25.    Mr. Hogan has an Axis I diagnosis of Generalized Anxiety Disorder, Panic Disorder, and Obsessive-Compulsive Disorder as well as an Axis II diagnosis of Borderline Personality Disorder and Histrionic Personality Disorder.

26.    Mr. Hogan has a history of experiencing panic attacks, during which he loses control over his actions, trembles, becomes nauseated, suffers abdominal distress, tachycardia, parasthesias, elevated blood pressure, and unsteady balance; he becomes debilitated and unable to perform any productive activity.

27.    Following these severe and often long lasting episodes, Mr. Hogan has experienced depressive episodes with a diminished interest in all activities, a loss of physical energy and feelings of worthlessness.

28.    Mr. Hogan's borderline personality disorder can cause his thinking to be dichotomous with no flexibility.

29.    Meanwhile, the histrionic component of Mr. Hogan's personality disorder can cause Mr. Hogan to display dramatic emotional behaviors.

30.    On the night of February 25, 2002, as a result of his mental health disorder, Mr. Hogan began to experience deterioration in his emotional condition and started to display irrational thinking, precipitating an attempt by Mrs. Hogan to intervene and redirect Mr. Hogan.

31.    At Mrs. Hogan's request, John Ditmars, a neighbor and close friend, came to the Hogan residence to assist Mrs. Hogan in calming Mr. Hogan, to redirect him, and to avert further emotional deterioration.

32.    While Mr. Ditmars was talking to Mr. Hogan, Mrs. Hogan, attempting to err on the side of caution in the event additional assistance was necessary, dialed 911 and was connected to the emergency dispatch service operated by Defendant Northampton County.

33.    Defendant Northampton County did not provide adequate training or supervision to its 911 dispatchers, and, in particular, failed to train and supervise its dispatchers regarding the requirements of the Americans with Disabilities Act and the rights of individuals with mental health disabilities.

34.    It was the policy, custom and practice of Defendant Northampton County to disregard the needs of those with psychiatric disabilities, and as a result, the County failed to provide adequate training to supervisors and dispatchers in connection with incidents involving emotionally disturbed persons.

35.    Pursuant to the County's policy, practice and custom, the County dispatch service did not ask Mrs. Hogan whether any of the people involved suffered from any disabilities, had any emotional disturbances, or required any reasonable accommodations.

36.    The County dispatch service advised Defendant officers that there was a domestic disturbance and that there was a possibility that a gun was involved.

37.    By the time the police arrived at the Plaintiffs' home, Mr. Hogan had calmed down considerably, he was unarmed, there was no dispute in progress, and there was no need for the police to be there or to remain.

38.    Officer Herncane arrived at the Plaintiffs' residence at approximately 8:05 p.m., while Mrs. Hogan was outside on the front porch, and Mr. Hogan was inside by himself.

39.     Officer Herncane asked Mrs. Hogan only where Mr. Hogan was and what his name was.

40.     In direct response, Mrs. Hogan advised Officer Herncane that his name was Michael Hogan, that he was inside the residence and that there was no one else inside, whereupon, without further inquiry, notice, or consent, Officer Herncane proceeded immediately into the Plaintiffs' residence.

41.     Officer Herncane did not ask Mrs. Hogan any questions about the reported basis for the call or about Mr. Hogan's mental state, and made no effort to determine whether there was any actual need or proper basis for the police to enter into the Plaintiffs' residence.

42.     Officer Herncane's entrance into the Plaintiffs' residence was contrary to accepted and proper police practices and in violation of the Plaintiffs' clearly established constitutional and statutory rights.

43.     Officer Herncane did not have a search warrant or an arrest warrant, he did not have probable cause to enter the residence, he did not have consent to enter the residence, and there were no exigent circumstances justifying his entrance into the residence.

44.     Officer Miller arrived approximately thirty (30) seconds after Officer Herncane and immediately followed him into the residence, without speaking to Mrs. Hogan or anyone else.

45.     Officer Miller also entered the Hogan residence improperly and in violation of the Hogans' federal rights; he did not have a search warrant or an arrest warrant, he did not have probable cause to enter the residence, he did not have consent to enter the residence, and there were no exigent circumstances justifying his entrance into the residence.

9

46.     Contrary to accepted and proper practice, Defendant officers arrived at the Hogan residence with their vehicles' emergency lights flashing.

47.     Before the officers entered his home, and upon seeing the flashing lights of police vehicles outside, Mr. Hogan, who did not have his glasses on, went down into his basement in an attempt to avoid any interaction with the police.

48.     Contrary to and in violation of the Plaintiffs' clearly established constitutional and federal statutory rights, and contrary to accepted police practices, Officers Herncane and Miller entered the residence and immediately began yelling for Mr. Hogan.

49.     Mr. Hogan replied from the basement, asking the officers why they were there, and whether he had done anything wrong.

50.     The officers answered Mr. Hogan and confirmed that he had not done anything wrong, and that he had not committed any crime.

51.     Mr. Hogan repeatedly and adamantly told the officers that he did not want them in his house, that they were violating his constitutional rights, and that they should leave.

52.     The officers did not leave.

53.     Lt. Orchulli and Officer Smith arrived within approximately ten (10) minutes or less, immediately and illegally entered the residence, and remained there despite Mr. Hogan's repeated demands that the officers leave.

54.     Mr. Hogan's cousin, E. Bruce ("Buddy") Shull, who is a police officer in a neighboring municipality, had arrived on the scene earlier, and Mr. Hogan's sister, Sara Hogan, who is an attorney, also arrived.

10

55.     The police officers on the scene were promptly advised by Mr. Hogan's family members that he was an emotionally disturbed person, that he suffered from anxiety and panic disorders and depression, and that he should be approached in a quiet, calm manner.

56.     Defendant officers, acting with deliberate indifference, willfully disregarded this information, and instead approached Mr. Hogan in a loud, hostile and confrontational manner.

57.     Defendant officers repeatedly violated accepted police practice standards for responding to domestic disturbances and for dealing with emotionally disturbed persons.

58.     Defendant officers, including but not limited to Defendant Miller, repeatedly lied to Mr. Hogan, squandering opportunities to establish his trust.

59.     Despite accepted police practice standards which dictate against the presence of K-9 units when responding to a domestic disturbance and when dealing with an emotionally disturbed person, Defendant officers brought police dogs to the scene and allowed them to remain there.

60.     When Mr. Hogan heard the police dogs barking, he commented on their presence and the officers responded by blatantly lying to Mr. Hogan, denying that the dogs were there.

61.     When Mr. Hogan demanded to know why the officers were in his house, Officer Miller said that they would leave as soon as they checked that Mr. Hogan was all right.

62.     Mr. Hogan advised them that he was indeed all right, and insisted again that they were violating his constitutional rights and that they should leave, but the officers remained.

63.     Lt. Orchulli repeatedly cursed at Mr. Hogan and treated him in a demeaning manner.

64.     At each turn, Defendant officers, acting with deliberate indifference, heightened the level of confrontation and escalated the tension.

11

65.     Mr. Hogan at various times asked the police to let him speak with his cousin, police officer Buddy Shull, and he also asked to be able to speak with his lawyer, Theresa Hogan; Ms. Hogan is a fifteen (15) year veteran legal practitioner in the City of Easton, who was known to the Defendants.

66.     Defendant officers, acting with deliberate indifference, refused to utilize these peaceful mechanisms for resolving the stand-off they had created, and instead isolated Mr. Hogan from his private sources of aid.

67.     Defendants further escalated the situation, contrary to accepted police practices and contrary to Plaintiffs' constitutional and federal statutory rights, as Defendant Orchulli and Defendant Mazzeo activated Defendant City's SWAT team.

68.     At or about the same time, Defendants Mazzeo, Parkansky, Beitler, Marraccini, Remaley, and Casterline, along with other police officers, improperly and unconstitutionally entered and remained on the Plaintiffs' property despite Mr. Hogan's insistence that the police leave.

69.     Mr. Hogan, continuing his desperate efforts to avoid a confrontation with police and in desperate fear of harm to himself, told the officers that if they could just tell him what he did wrong he would come upstairs, and that, if he did not do anything wrong, they should leave.

70.     The officers acknowledged that Mr. Hogan had not done anything wrong but that they were nonetheless not going to leave his house.

71.     Mr. Hogan could hear the officers engaging in loud destructive action above the basement, which turned out to be their removal of the basement door from its hinges and the moving of his furniture.

72.    As a result of Defendants' misconduct, including their reckless actions and inactions, Mr. Hogan's emotional state decomposed.

73.    Mr. Hogan felt trapped and was severely fearful of the police officers surrounding him.

74.    Mr. Hogan felt like a cornered animal.

75.    Mr. Hogan became increasingly despondent about the situation, and the Defendant officers knew and/or reasonably should have known of his deteriorating emotional state.

76.    As Defendant officers were aware, Mr. Hogan had a shotgun in his basement, which he picked up in self-defense.

77.    For approximately an hour and a half, Defendants Miller and Orchulli communicated with Mr. Hogan, under the supervision of Defendant Parkansky.

78.    As a result of the despondency and feelings of desperation brought on by Defendants' actions and inactions, Mr. Hogan announced that he was going to count down and that if the police did not leave, something bad would happen; he counted down, but the police did not leave.

79.    In frustration that the Defendant Officers would not leave his home although they had confirmed that Mr. Hogan had done nothing wrong, and out of continuing fear that he would be harmed by the officers, Mr. Hogan counted down again, and this time when he got to zero and the police had not left, Mr. Hogan fired one lone shot of birdshot into the basement wall; Mr. Hogan neither intended to cause any harm nor did he cause any harm.

80.    Defendant officers, acting like they believed that Mr. Hogan may have shot himself, called out to him to determine whether he had done so.

81.     Mr. Hogan immediately realized that he had erred in firing his weapon, and after a period of silence, told the police that he was all right and that he had not meant to do what he had done.

82.     At all relevant times, Defendant officers knew and/or should have known that Mr. Hogan was not a viable threat to them and they made it clear to Mr. Hogan that they did not consider him to be a viable threat.

83.     Defendant officers continued to escalate the tension and advised Mr. Hogan that, even though they might have been able to leave, they were not going to leave.

84.     The officers said that if Mr. Hogan put his gun down they would let him talk to his cousin, police officer Buddy Shull.

85.     Mr. Hogan complied, but the officers reneged on their promise, refusing Mr. Hogan the opportunity to speak with Mr. Shull.

86.     Defendants' conduct caused Mr. Hogan's mental state to decompose further.

87.     Mr. Hogan released water from the steam boiler in his basement and told the police that he had turned the gas on and that if they shot at him they would cause the house to blow up.

88.     The police had officers outside Mr. Hogan's basement windows, who could see that he was releasing water, not gas, into the basement.

89.     Mr. Hogan never intended to harm the officers and never attempted to harm the officers.

90.     Mr. Hogan was exhausted and wanted the confrontation to end.

14

91.    As confirmed by the current Chief of Police, Steven Mazzeo, who was then a Lieutenant, Officer Miller instructed Mr. Hogan to come to the top of the steps, lay down his weapon on the landing, and surrender.

92.    Eventually there was a prolonged period during which Mr. Hogan could not hear any noises on the floor above him, and he believed that the officers were no longer in the immediate vicinity of the landing at the top of his basement steps and that it was now safe for him to surrender without being harmed.

93.    He disarmed his weapon, and in an attempt to demonstrate that it was unloaded and could not be fired, and therefore was not a threat, Mr. Hogan pulled the bolt back and the lever down.

94.    Mr. Hogan climbed the steps and arrived on the landing at the top of the steps in a non-threatening manner intending to fully surrender to the police.

95.    As he bent over to surrender his complete safe weapon by placing it down on the floor, Defendants Orchulli, Remaley, Marraccini, Beitler and Casterline, without providing any warning, opened fire on Mr. Hogan, firing at least 14 shots.

96.    Because the officers were positioned at opposite ends of the house targeting Mr. Hogan in the middle, when some of their shots missed Mr. Hogan they ricocheted in the direction of the officers on the other side of the house.

97.    After at least one of the Defendant officers fired live rounds at Mr. Hogan, Defendant Casterline fired an allegedly non-lethal weapon that filled the house with smoke, making it impossible for the officers to see that Mr. Hogan had already been hit.

98.    Nonetheless, the officers continued to fire on Mr. Hogan.

99.     Defendant officers' shots hit Mr. Hogan in his stomach, his right hand, and his left wrist, causing an arterial bleed.

100.    With Mr. Hogan laying on the floor, the officers yelled, "don't move!" and "show us your hands!"

101.    Defendant Mazzeo came over to where Mr. Hogan laid bleeding on the floor and stepped on Mr. Hogan's wrist, crushing his wrist, making an audible crunch, and causing Mr. Hogan to pass out momentarily.  Mr. Hogan regained consciousness when the officers hand-cuffed and dragged him across the floor to the next room.

102.    Defendant officers then left Mr. Hogan to die on the floor.

103.    Defendant officers did not attend to Mr. Hogan's wounds.

104.    Instead, Mr. Hogan's cousin Buddy Shull entered the residence and attempted to stop Mr. Hogan's bleeding.

105.    Despite activating SWAT, Defendants did not have an ambulance immediately available at Plaintiffs' residence, which caused a delay in getting Mr. Hogan the immediate medical attention he required.

106.    Ultimately, Mr. Hogan had to be evacuated via helicopter to a trauma unit.

107.    Mr. Hogan spent approximately eight (8) days in the hospital, followed by approximately five (5) months recuperating at home.

108.    At all relevant times, Defendants knew and/or should have known that Mr. Hogan had serious mental and emotional health problems.

109.    Nonetheless, Defendants created and/or substantially increased the risk of harm to Mr. Hogan.

110.    Defendants acted with deliberate indifference to Mr. Hogan's serious medical needs and significantly restricted his freedom to act on his own behalf.

111.    Defendants have acted with malice and/or callous indifference toward Plaintiffs' federal constitutional and statutory rights.

112.    At all times during the events described above each of the Defendant officers agreed with and assisted each of the other officers in performing the various actions described and lent their support and the authority of their office to each other during said events.

113.    Defendants each advised, assisted, ratified and/or directed the actions taken against Mr. Hogan.

114.    Each of the Defendant officers played a substantial role and provided input which affected the adverse actions against Plaintiffs.

115.    Defendant officers used unnecessary, unreasonable and excessive force against Mr. Hogan.

116.    Defendants' conduct shocks the conscience.

117.    Defendants acted with malice and/or deliberate indifference toward Plaintiffs and their federal rights.

118.    Mr. Hogan's serious life-threatening injuries were a foreseeable and direct result of Defendants' actions and inactions.

119.    Defendants violated the Plaintiffs' clearly established and well settled federal constitutional rights, including but not limited to the right to liberty, and personal security, the right to be free from unreasonable searches and seizures, and the right to be free from the use of excessive, unreasonable and unjustified force.

120.    Mr. Hogan's constitutional rights were clearly established at the time of Defendants' actions.

121.    City of Easton police officers, including those named as defendants herein, have a pattern and practice of using unreasonable and excessive force and violating the civil rights of those with whom they come into contact.

122.    Defendants City, Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky have, with deliberate indifference, failed to adequately train, supervise and discipline their officers to prevent civil rights violations within the City, and the injuries to Plaintiffs were caused by, and were a foreseeable consequence of, such failures.

123.    Defendants City, Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky have, with deliberate indifference, failed to adequately train and supervise their officers concerning the proper way to respond to a report of a domestic disturbance, and the injuries to Plaintiffs were caused by, and were a foreseeable consequence of, such failures.

124.    Defendants City, Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky have, with deliberate indifference, failed to adequately train and supervise their officers concerning the proper use of K-9 units, and the injuries to Plaintiffs were caused by, and were a foreseeable consequence of, such failures.

125.    Defendants City, Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky have, with deliberate indifference, failed to adequately train and supervise their officers concerning the proper use of police vehicle emergency lights, and the injuries to Plaintiffs were caused by, and were a foreseeable consequence of, such failures.

126.    Defendants City, Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky have, with deliberate indifference, failed to adequately train and supervise their officers concerning the proper use of negotiators, and the injuries to Plaintiffs were caused by, and were a foreseeable consequence of, such failures.

127.    Defendants City, Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky have, with deliberate indifference, failed to adequately train and supervise their officers concerning the proper way to respond calls involving emotionally disturbed persons, and the injuries to Plaintiffs were caused by, and were a foreseeable consequence of, such failures.

128.    Defendants City, Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky have, with deliberate indifference, failed to adequately train and supervise their officers concerning the proper way to handle a barricaded gunman situation, and the injuries to Plaintiffs were caused by, and were a foreseeable consequence of, such failures.

129.    Defendants City, Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky have, with deliberate indifference, failed to adequately train and supervise their officers concerning the proper activation and use of SWAT, and the injuries to Plaintiffs were caused by, and were a foreseeable consequence of, such failures.

130.    Defendants City, Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky have, with deliberate indifference, failed to adequately train and supervise their officers concerning the proper use of force and deadly force, and the injuries to Plaintiffs were caused by, and were a foreseeable consequence of, such failures.

131.    Defendants City, Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky have, with deliberate indifference, failed to adequately train and supervise their officers concerning the proper use of firearms in a setting with poor visibility, and the injuries to Plaintiffs were caused by, and were a foreseeable consequence of, such failures.

132.    Defendants City, Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky have, with deliberate indifference, failed to adequately train and supervise their officers concerning the proper provision of medical care to injured suspects, and the injuries to Plaintiffs were caused by, and were a foreseeable consequence of, such failures.

133.    Defendants Goldsmith, Palmer and Mazzeo, Orchulli and Parkansky knew and/or reasonably should have known that they and the City had provided inadequate training, supervision and discipline to Defendant officers, and that this failure of training, supervision and discipline was likely to result in the constitutional and statutory violations that caused Mr. Hogan's injuries.

134.    As a direct and proximate result of the Defendants' unlawful and discriminatory actions and inactions against Plaintiffs, Plaintiffs have suffered grievously and needlessly.

135.    Defendants' actions and inactions have caused Mr. Hogan permanent disabling and disfiguring injuries.

20

136.    Defendants' actions and inactions have caused Michael Hogan and Ann Hogan extreme emotional distress.

137.    As a direct and proximate result of the Defendants' actions and inactions as alleged, Michael and Ann Hogan have experienced extreme mental and physical pain and suffering, the loss of liberty, the loss of their ability to enjoy the pleasures of life.

138.    As a direct and proximate result of Defendants' actions and inactions, Mr. Hogan has lost earnings and earning capacity and he has lost the ability to provide services and earnings to his family.

139.    Plaintiffs suffered damage to their real and personal property and other incidental damages as a result of Defendants' actions and inactions.

140.    Also as a result of Defendants' actions, Plaintiffs were forced to incur significant medical expenses.

141.    As a further result of Defendants' actions, Plaintiff Ann Hogan has suffered a loss of consortium, including a loss of Michael Hogan's services, contributions, society, comfort and companionship.

### COUNT I - VIOLATION OF THE AMERICANS WITH DISABILITIES ACT DEFENDANTS CITY OF EASTON AND NORTHAMPTON COUNTY

142.    The allegations of all the preceding and subsequent sections and paragraphs of this Complaint are realleged herein as if fully set forth.

143.    Mr. Hogan was at all relevant times, a person with a disability, as such term is defined by the Americans with Disabilities Act, in that he had a significant impairment of one or more major life functions, had a record of being so impaired, and/or was regarded by Defendants as being so impaired.

144.    As reflected in the actions taken against Mr. Hogan, it was the policy and custom of the City of Easton and Northampton County to discriminate against and fail to accommodate persons with disabilities, including emotionally disturbed persons.

145.    Prior to the events described herein, the City of Easton and Northampton County developed and maintained policies and/or customs exhibiting deliberate indifference to the rights of persons with disabilities, including the rights of emotionally disturbed persons, which caused the violation of Mr. Hogan's rights.

146.    It was the policy and/or custom of the City of Easton to inadequately and improperly supervise police interactions with emotionally disturbed persons.

147.    It was the policy and/or custom of the City of Easton and Northampton County to inadequately supervise and train its officials, including those identified herein, thereby failing to adequately prevent violations of the rights of people with disabilities including the rights of emotionally disturbed persons, such as Mr. Hogan.

148.    The City and County did not require appropriate in-service training and/or re-training of officials concerning the rights of people with disabilities, including the rights of emotionally disturbed persons.

149.    Defendants City and County violated Michael Hogan's federally guaranteed right to be free from discrimination on the basis of disability by failing to make reasonable modifications to their

policies, practices and procedures to ensure that his needs as an individual with a disability would be met.

150.    As a direct and proximate result, Plaintiffs were injured as stated herein.


COUNT II - VIOLATION OF 42 U.S.C. § 1983
DEFENDANT CITY OF EASTON

151.    The allegations of all the preceding and subsequent sections and paragraphs of this Complaint are realleged herein as if fully set forth.

152.    The decisions and actions of the officials of the City of Easton as set forth herein represented and constituted the official policy and/or customs of the City of Easton.

153.    As reflected in the actions taken against Mr. Hogan, it was the policy, practice and/or custom of the City of Easton to use excessive force against people within the City.

154.    Prior to the events described herein, the City of Easton developed and maintained policies, practices and/or customs exhibiting deliberate indifference to the constitutional rights of persons within the City, which caused the violation of Mr. Hogan's rights.

155.    It was the policy and/or custom of the City of Easton to inadequately and improperly investigate citizen complaints of constitutional violations by city officials, and such violations were instead tolerated by the City.

156.    It was the policy, practice and/or custom of the City of Easton to inadequately supervise and train its officials, including those identified herein, thereby failing to adequately prevent and discourage further civil rights violations on the part of its officials.

23

157.    The City did not require appropriate in-service training or re-training of officials who were known to have engaged in civil rights violations.

158.    As a result of the policies, practices and/or customs of the City, including those identified above, City officials, including those named herein, believed that their unconstitutional and unlawful actions would not be investigated or censured, but would be tolerated.

159.    The City's policies, practices and customs demonstrate a deliberate indifference on the part of policymakers of the City of Easton -- including Defendants Goldsmith and Palmer -- to the constitutional rights of persons within the City, and were the cause of the violations of Plaintiffs' rights as alleged herein.

160.    As a direct and proximate result, Plaintiffs were injured as stated herein.


<u>COUNT III  - 42 U.S.C.  1983</u>
<u>DEFENDANTS GOLDSMITH, PALMER, MAZZEO, ORCHULLI AND PARKANSKY</u>

161.    The allegations of all the preceding and subsequent sections and paragraphs of this Complaint are realleged herein as if fully set forth.

162.    Defendants Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky inadequately supervised and trained the City's police officers, including those identified herein, thereby failing to adequately prevent and discourage civil rights violations on the part of its officials.

163.    Defendants Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky acted with deliberate indifference to the constitutional rights of persons within the City, and were the cause of the violations of Plaintiffs' rights as alleged herein.

164.     Defendants Goldsmith, Palmer, Mazzeo, Orchulli and Parkansky failed to adequately and properly investigate citizen complaints of constitutional violations by city officials, and such violations were instead tolerated.

165.     As a direct and proximate result, Plaintiffs were injured as stated herein.

### COUNT IV - 42 U.S.C. § 1983 - UNREASONABLE SEARCHES AND SEIZURES VIOLATION OF FOURTH AMENDMENT RIGHTS DEFENDANTS HERNCANE, MILLER, SMITH, ORCHULLI, MAZZEO, BEITLER, MARRACCINI, REMALEY, CASTERLINE AND PARKANSKY

166.     The allegations of all the preceding and subsequent sections and paragraphs of this Complaint are realleged herein as if fully set forth.

167.     Defendants Herncane, Miller, Smith, Orchulli, Mazzeo, Beitler, Marraccini, Remaley, Casterline, and Parkansky, acting in concert under color of law, denied Michael Hogan and Ann Hogan their rights under the Fourth Amendment to the United States Constitution, including their right to be free from unreasonable searches and seizures, in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1983.

168.     As a direct and proximate result, Plaintiffs were injured as stated herein.

### COUNT V - 42 U.S.C. § 1983 - UNREASONABLE USE OF FORCE VIOLATION OF FOURTH AMENDMENT RIGHTS DEFENDANTS HERNCANE, MILLER, SMITH, ORCHULLI, MAZZEO, BEITLER, MARRACCINI, REMALEY, CASTERLINE, AND PARKANSKY

169.     The allegations of all the preceding and subsequent sections and paragraphs of this Complaint are realleged herein as if fully set forth.

170.     Defendants Herncane, Miller, Smith, Orchulli, Mazzeo, Beitler, Marraccini, Remaley, Casterline, and Parkansky, acting in concert under color of law, denied Mr. Hogan his rights under the Fourth Amendment to the United States Constitution, including his right to be free from the use of excessive force, in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1983.

171.     As a direct and proximate result, Plaintiffs were injured as stated herein.

## COUNT VI - 42 U.S.C. § 1983 - SUBSTANTIVE DUE PROCESS VIOLATION OF FOURTEENTH AMENDMENT RIGHTS DEFENDANTS HERNCANE, MILLER, SMITH, ORCHULLI, MAZZEO, BEITLER, MARRACCINI, REMALEY, CASTERLINE, AND PARKANSKY

172.     The allegations of all the preceding and subsequent sections and paragraphs of this Complaint are realleged herein as if fully set forth.

173.     Defendants Herncane, Miller, Smith, Orchulli, Mazzeo, Beitler, Marraccini, Remaley, Casterline, and Parkansky, acting in concert under color of law, denied Mr. Hogan his rights under the Fourteenth Amendment to the United States Constitution, including his right to personal security and to be free from arbitrary government action that shocks the conscience, in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1983.

174.     As a direct and proximate result, Plaintiffs were injured as stated herein.

## COUNT VII - 42 U.S.C. § 1983 - ABUSE OF PROCESS VIOLATION OF FOURTEENTH AMENDMENT RIGHTS DEFENDANTS ORCHULLI & SMITH

175.     The allegations of all the preceding and subsequent sections and paragraphs of this Complaint are realleged herein as if fully set forth.

176.    Defendants Orchulli and Smith have instituted civil litigation against Mr. Hogan in the Court of Common Pleas of Northampton County, Pennsylvania.

177.    Defendants Orchulli and Smith have employed legal process against Mr. Hogan for unlawful purposes, including to harm and intimidate Mr. Hogan and to keep him from vindicating his federal civil rights.

178.    Defendants Orchulli and Smith have used legal process against Mr. Hogan primarily to accomplish a purpose for which such process was not designed.

179.    Defendants Orchulli and Smith have violated Mr. Hogan's rights under the Fourteenth Amendment to the United States Constitution, including his right to be free from abuse of process, in violation of the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1983.

180.    As a direct and proximate result, Plaintiff Michael Hogan has been injured as stated herein, and as suffered added emotional distress and incurred legal expenses to defend himself against Defendant Orchulli and Smith's improper legal action.

<u>REQUESTED RELIEF</u>

WHEREFORE, Plaintiffs request that the Court find and determine, after trial by jury as appropriate, that Plaintiffs have suffered substantial and continuing injury as a result of deprivation of their civil and Constitutional rights, discrimination, and otherwise wrongful conduct and award the following relief, as appropriate:

(a) a declaration that Defendants have violated Plaintiffs' civil rights;

(b) compensatory damages in excess of $150,000;

(c) prejudgment interest, attorneys' fees and costs;

27

(d) punitive damages against the individual defendants in their individual capacities;

(e) such other legal and equitable relief as the Court deems just and proper.

JURY TRIAL DEMANDED

Date:   February 23, 2004

_____

JORDAN B. YEAGER
Attorney I.D. No. 72947
BOOCKVAR & YEAGER
8 West Oakland Avenue
Doylestown, PA 18901
215-345-8581
Counsel for Plaintiffs